FILED
2020 Sep-17  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KENTON L. HOWARD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:17-cv-02163-RDP** |
| | } | |
| **NORFOLK SOUTHERN** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant's Motion for Summary Judgment. (Doc. # 49).

The Motion has been fully briefed (Docs. # 50, 59, 63) and is under submission. After careful

review, and for the reasons discussed below, the court concludes that Defendant's Motion for

Summary Judgment (Doc. # 49) is due to be denied.

## I.    Factual Background[1]

Plaintiff Kenton Howard was conditionally hired by Defendant Norfolk Southern

Corporation ("Defendant" or "Norfolk") as a conductor-trainee on June 1, 2006. (Doc. # 51-1 at

76;[2] Doc. # 51-2 at 17). Norfolk is a "freight railroad that operates large freight trains weighing

and hauling thousands of tons on more than 20,000 route miles in 22 states and the District of

Columbia." (Doc. # 51-7 at 1, ¶ 3). The duties of a conductor involve "assembl[ing] railcars

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] When the court cites to deposition testimony, the court references the document number and page number but not the specific line reference within the deposition transcript.

together to form a train," "separat[ing] out or 'uncoupl[ing]' a car or group of cars from an assembled train," "mov[ing] or 'throw[ing]' track switches to align track sections," "apply[ing] and release[ing] hand brakes on train cars," "lift[ing] and carry[ing] telemetry units," and "install[ing] . . . train 'knuckle[s].'" (Doc. # 51-2 at 25). A conductor is expected to be able to "avoid drowsiness and stay mentally alert, including during periods of no physical activity (e.g., when riding in [the] cab of [a] moving locomotive and being on lookout for signals[] and monitoring track conditions)." (Doc. # 51-2 at 25). The position is considered "safety sensitive," and Plaintiff has acknowledged that "[y]ou ha[ve] to be paying attention at all times while [working]." (Doc. # 51-1 at 118). Conductors are considered to have the "lowest seniority," meaning they have little control over their work schedules, frequently work nights, weekends, and holidays, and often have shifts that last up to twelve hours. (Doc. # 51-1 at 102-03, 118-19; Doc. # 51-7 at 2, ¶ 11).

Under the conditions of Plaintiff's employment offer, he was required to undergo a background check and "pre-hire" medical examination.[3] (Doc. # 51-1 at 81; Doc. # 51-2 at 17). On June 13, 2006, Plaintiff met with Dr. Kristin Brunsrold for his medical examination. (Doc. # 51-3 at 1). During this examination, Plaintiff disclosed that he had surgery in 1994 to repair an ACL tear on his left knee. (Doc. # 51-3 at 2). However, Plaintiff stated that he had no limitations from the surgery, and he was not taking any medication (either prescription or non-prescription).[4]

---

[3] Under Defendant's "medical policy," "[e]mployees [were required to] notify the company medical officer of any condition not already on record . . . which could impair their ability to perform their duties. This notification must be made immediately upon the employee receiving knowledge of the condition[] and is not limited to those conditions discovered during required medical examinations." (Doc. # 57-1 at 11).

[4] While the Rule 56 record is silent as to whether Plaintiff was actively taking prescription medication at the time of this medical examination in June 2006, the record shows that Plaintiff took Oxycodone in December 2005. Specifically, on December 5, 2005, Plaintiff was discharged as a patient of Dr. Michael G. Gibson with the Birmingham Pain Center after he tested positive for cocaine while taking Oxycodone. (Doc. # 51-4 at 15). However, Plaintiff testified that he does not recall ever receiving Oxycodone from Dr. Gibson; he testified he only went to the

(Doc. # 51-1 at 81; Doc. # 51-3 at 2). Dr. Brunsrold "recommend[ed that Plaintiff was] qualified with no work restrictions/accommodations." (Doc. # 51-3 at 3).

On June 16, 2006, Norfolk sent a letter to Plaintiff regarding his left knee surgery. Norfolk requested Plaintiff obtain and submit a written report from his physician stating that his knee was stable or that any issues with his knee had been resolved and that Plaintiff was able to safely perform the essential functions of his position. (Doc. # 51-3 at 4). On June 20, 2016, Dr. Brian Cressman, a physician at the Walker Wellness Center, confirmed in writing that Plaintiff's knee issue "ha[d] resolved" and that Plaintiff had no work restrictions. (Doc. # 51-3 at 7). Plaintiff, however, testified that Dr. Cressman was not his physician and "was just somebody [he] went to to get a letter [so] [he] could go to work. [Dr. Cressman] [was] not an orthopedic. [He was] just a regular doctor . . . I  . . . went [to] . . . [for an] evaluation . . . ." (Doc. # 51-1 at 132-33).

On July 10, 2006, Defendant employed Plaintiff as a full-time conductor-trainee. (Doc. # 51-2 at 21). He remained a conductor-trainee for approximately four or five months until he "mark[ed] up," at which point he became a brakeman. (Doc. # 51-1 at 82-83). He remained a brakeman until he was promoted to conductor. (Doc. # 51-3 at 20).

Beginning in early 2007, Plaintiff began to experience pain in his knees and back. (Doc. # 51-1 at 89-90). Plaintiff informed Trainmaster Steve Smith that he was experiencing this pain and asked Smith how Norfolk "handle[d] prescriptions." (Doc. # 51-1 at 89). Plaintiff asked Smith if he could get a list of all the medications employees were allowed to take or were prohibited from taking. (Doc. # 51-1 at 90). Smith told him there was no list and that if Plaintiff had a prescription for it, he was "good." (Doc. # 51-1 at 90). Plaintiff also testified that he called Norfolk's "medical" department to further inquire about a medication list and again was informed that there was not a

---

Birmingham Pain Center for spinal blocks. (Doc. # 51-1 at 168). In any event, Plaintiff contends the positive cocaine test was the result of the Birmingham Pain Center mixing his test with someone else's. (Doc. # 51-1 at 168).

list but that he needed to tell them what medications he was taking. (Doc. # 51-1 at 91).

Plaintiff testified that, in early 2007, he went to see a pain management specialist, Dr. Ali, for his knee and back pain; he did not go to an orthopedist.[5] (Doc. # 51-1 at 92-93). Dr. Ali prescribed Plaintiff 40 milligrams of Oxycodone, to be taken twice a day.[6] (Doc. # 51-1 at 93-94). Around this same time, Plaintiff was also diagnosed with a sagittal tear in his L-4 in his back. (Doc. # 51-1 at 95). Plaintiff did not see a doctor to get a diagnosis for his knee pain;[7] he believed the pain was related to screws implanted in his knee during his ACL surgery in 1994. (Doc. # 51-1 at 95-96). Plaintiff did not inform any of his supervisors or co-workers that he was seeing a pain management specialist, that he was diagnosed with a back condition, or that he was taking prescription drugs. (Doc. # 51-1 at 95).

Effective October 16, 2007, Plaintiff was promoted from conductor to "Operations Supervisor Trainee." (Doc. # 51-1 at 83-84; Doc. # 51-3 at 18-19). In that new position, Plaintiff "was responsible for supervising [] employees[] [and] making sure they followed the rules . . . safely[] [and] efficiently." (Doc. # 51-1 at 85). Plaintiff was also trained "in accident and scene investigation where if there was a car versus train, [he] would be able to know what to look

---

[5] The Rule 56 record is unclear as to the precise date Plaintiff first saw Dr. Ali, as well as when he first began seeing other pain management specialists. Specifically, Plaintiff testified that he first went to a pain management specialist, Dr. Ali, in 2007, but his medical records from St. Jude Thaddeus Internal Medicine show that he was first introduced to pain management medication by Dr. Boswell in 2003. (Doc. # 51-5 at 14). These records demonstrate that Plaintiff saw Dr. Boswell from 2003-2004 and Dr. Ali from 2004-2005. (Doc. # 51-5 at 14). Additionally, Plaintiff's pharmacy records support that inference and indicate that Plaintiff was filling prescriptions for Percocet and Hydrocodone (both opioids) in 2003 and 2005. (Doc. # 51-5 at 64).

[6] On April 13, 2016, Dr. Ali was convicted of prescribing controlled substances outside the scope of professional medical practice and without a legitimate medical purpose in violation of 21 U.S.C. § 841. (Doc. # 51-8).

[7] From 2006 to present, Plaintiff testified that he never received any formal diagnosis from an orthopedist related to the cause of his knee pain in either knee. (Doc. # 51-1 at 183). Notwithstanding, Plaintiff testified that he was diagnosed with a meniscus tear in his right knee in 2006 or 2007. (Doc. # 51-1 at 192-93). Plaintiff could not recall the physician who diagnosed him or provide any medical documentation regarding this tear. (Doc. # 51-1 at 193).

for. [He] was trained in . . . teaching classes to engineers and conductors and brakemen on safety [a]nd just monitoring and mak[ing] sure the workers worked safely and got their work done." (Doc. # 51-1 at 85). Plaintiff testified that one of the reasons he accepted the promotion "was because [his] knees and . . . back had started hurting . . . from walking on the ballast stone . . . , and [he] figured [he] could go to this job and [he] would be fine" and not have to walk "three to four miles every shift on the ballast stone." (Doc. # 51-1 at 88). There is nothing in the Rule 56 record suggesting Plaintiff informed anyone at Norfolk this was the reason he took the position.

On April 27, 2008, Plaintiff resigned his new position before he was to be made a full-time Operations Supervisor. (Doc. # 51-2 at 24). Plaintiff testified he resigned because Superintendent Bryson and Trainmaster Smith told him that "[he] was [required] . . . to find faults . . . in people [as a supervisor], meaning [he] [was] put on the quota system [and] . . . had to find 'X' number of disciplinary rule violations in a month's time period," even if no rule violation had occurred. (Doc. # 51-1 at 87-88). Plaintiff also resigned because the position "was more demanding than he could handle." (Doc. # 51-1 at 96; Doc. # 51-2 at 24). After stepping down from the Operations Supervisor Trainee position, Plaintiff resumed his position as conductor. (Doc. # 51-1 at 99).

Plaintiff testified he first saw Dr. Elliot Rampula in 2008. (Doc. # 51-1 at 100). Dr. Rampula began prescribing Plaintiff Oxycodone and Adderall. (Doc. # 51-1 at 100). Plaintiff testified that he does not recall the dosage of Oxycodone Dr. Rampula prescribed him but that he believed it was around 120 milligrams per day. (Doc. # 51-1 at 104).

On May 27, 2009, Norfolk required Plaintiff to undergo another medical examination. (Doc. # 51-1 at 134; Doc. # 51-3 at 8). Plaintiff did not inform Norfolk that he was experiencing any knee pain or back pain, and he had not informed Norfolk that he was taking any medication—notwithstanding the fact that, at the time of this examination, he was taking high levels of

Oxycodone. (Doc. # 51-1 at 135; Doc. # 51-3 at 8). Plaintiff testified he did not disclose he was taking Oxycodone because that "[was] [his] personal medical information." (Doc. # 51-1 at 136).

When Dr. Rampulla died, Plaintiff sought other pain management physicians. He briefly saw Dr. Mangieri. (Doc. # 51-1 at 279). After Dr. Mangieri, in 2010, Plaintiff went to Dr. Rudy Veluz. Dr. Veluz was the first physician to prescribe Plaintiff Methadone[8] for his knee and back pain.[9] (Doc. # 51-1 at 184).

On April 8, 2011, Plaintiff underwent another medical examination with Dr. Donald Battle. (Doc. # 51-3 at 13). Unlike in his 2009 examination, this time Plaintiff indicated that he was experiencing knee pain; however, he did not indicate that he was experiencing back pain. (Doc. # 51-1 at 138; Doc. # 51-3 at 13). Plaintiff did not disclose to Dr. Battle that he was taking any medications during this examination, even though he testified that during this time, he was taking anywhere between 120 and 180 milligrams of Oxycontin (or Oxycodone) per day and 30-40 milligrams of Methadone per day.[10] (Doc. # 51-1 at 140).

On February 23, 2012, Dr. Veluz examined Plaintiff at St. Jude Thaddeus Internal Medicine in Irondale, Alabama. (Doc. # 51-5 at 13). Plaintiff presented with "chronic bilateral knee pain w/ surgery," (2) "left knee meniscus [and] anterior cruciate ligament repair," (3) "3 right knee arthroscopes[,] bilateral joint effusion[,] and swelling," and (4) "arthritic changes – left knee

---

[8] Plaintiff testified that throughout the time he was taking Oxycodone and Methadone, he had filled prescriptions at approximately six different pharmacies. (Doc. # 51-1 at 187). He testified that he would have to go to other pharmacies when one would be out of the medication. (Doc. # 51-1 at 186). Additionally, Plaintiff testified that on April 18, 2008, he saw Tim Lovely at Urgent Care after he cut his finger and was prescribed 10 milligram pills of Oxycontin, which he was taking on top of the Oxycodone at the same time. (Doc. # 51-1 at 274-75).

[9] Plaintiff stopped seeing Dr. Veluz in April 2012 (because Dr. Veluz had his medical license revoked) and went to Dr. Wilbon Bates in Trussville, Alabama. Dr. Bates continued to prescribe Plaintiff Oxycodone and Methadone—approximately 180 milligrams and 30-40 milligrams per day, respectively. (Doc. # 51-1 at 178, 207, 259).

[10] The examination form also shows that Plaintiff was consuming creatine for muscle growth. However, Plaintiff disputes the handwriting on the form and contends he did not write that. (Doc. # 51-3 at 14).

repair." (Doc. # 51-5 at 16). During this exam, Dr. Veluz noted that Plaintiff's current treatment regimen (i.e., the pain medication) was "indefinite at [that] time" but that Plaintiff "[was] able to do daily activities [and] work at a normal pace in his work environment." (Doc. # 51-5 at 10). At the time of this visit, Plaintiff's prescribed dosage was as follows: (1) 10 milligrams of Methadone twice a day; (2) 30 milligrams of Oxycodone for breakthrough pain (around two to three times per day); and (3) 30 milligrams of Adderall per day.[11] (Doc. # 51-5 at 15). Dr. Veluz noted that Plaintiff "[was] able to perform all duties[,] ha[d] no side effects from his medication[, was] able to have a quality of life w/ [his] medication[, and] ha[d] no restrictions while taking his medication." (Doc. # 51-5 at 15).

Under Norfolk's medical policy, employees were required to undergo medical examinations and submit to random drug testing. (Doc. # 51-1 at 160). Norfolk's "Alcohol and Drug policy forbid[s] the active employment of persons who use drugs which may impair sensory, mental[,] or physical function." (Doc. # 51-9 at 1, ¶ 3). Specifically, Defendant's policy stated: "short-acting medications that may cause sedation, weakness, fatigue, confusion, dizziness[,] and similar side effects should not be taken by employees in safety-sensitive and/or non-sedentary positions while at work or within 6 hours (time may vary depending on medication half-life) of reporting to work." (Doc. # 51-5 at 30). The policy also noted that amphetamines and narcotics (i.e., Oxycodone, Adderall, etc.) could be used by employees while on duty if an employee's:

> treating physician provide[d] to [Defendant] a written statement indicating that the underlying medical condition [was] controlled, that the employee [was] compliant with medication use, that [the] medication [was] taken on [a] chronic, regularly scheduled basis, that the physician [was] familiar with [the] job requirements[,] and that the employee [was] not experiencing adverse side effects from [the] medication that would prevent safe performance of duties.

---

[11] In 2012, Plaintiff also began taking Zanaflex -- an anti-inflammatory -- but he stopped taking it because it did not work for him. (Doc. # 51-1 at 218).

(Doc. # 51-5 at 31-32). Plaintiff did not inform any of his supervisors -- or anyone employed by Defendant for that matter -- that he was taking prescription medication until April 2012. But, Plaintiff testified that he was never given these guidelines so he was unaware of the policy regarding prescription medications. (Doc. # 51-1 at 228-29).

On February 12, 2012, Plaintiff tested positive for cocaine after taking a random drug test. (Doc. # 51-9 at 2, ¶ 5). On February 27, 2012, Plaintiff was notified by Dr. Ray Prible, Norfolk's Chief Medical Officer, of his positive test.  (Doc. # 51-9 at 10). As a result, Plaintiff was prohibited from returning to his duties as conductor, and he was instructed to contact the Manager at Defendant's Drug and Alcohol Rehabilitation Services ("DARS") by March 4, 2012. (Doc. # 51-9 at 10). Plaintiff was also required to (1) complete the evaluation and any rehabilitation required by DARS, (2) sign the Authorization Form allowing for the release of DARS information needed in the return to service determination, and (3) arrange to provide a negative urine sample at a medical facility designated by Defendant within 45 days of the date of receipt of the letter, unless DARS determined that additional time was necessary. (Doc. # 51-9 at 10). Plaintiff was also notified that any failure to timely complete the above actions would subject him to dismissal. (Doc. # 51-9 at 10).

On March 9, 2012, Plaintiff met with Myles Scully, his assigned DARS counselor. (Doc. # 51-5 at 38). Plaintiff testified that he told Scully he had never used cocaine prior to the random drug test. (Doc. # 51-1 at 161). Rather, Plaintiff told Scully that the positive test likely came from the type of tea he was drinking, as it was a stimulant that he ordered off the Internet. (Doc. # 51-1 at 161). Scully noted in Plaintiff's DARS file that Plaintiff was "very . . . energized in [his] denial (consistent w/ coke use?)." (Doc. # 51-9 at 14).[12] Thus, on March 10, 2012, Scully recommended

---

[12] Plaintiff provided Scully with the receipt for the tea on March 30, 2012. (Doc. # 51-9 at 3, 15, ¶ 12).

that Plaintiff successfully complete the following treatment before returning to his conductor duties: (1) abstain from prohibited substances; (2) complete 8 hours of education on drugs and alcohol; (3) participate in testing to insure compliance with recommendations; (4) report to Scully information gleaned by attendance to the aforementioned program; and (5) attend at least 3 AA or NA meetings to supplement this education. (Doc. # 51-9 at 16).

On April 3, 2012, Plaintiff was administered an expanded drug test because Scully "had a reasonable suspicion that [Plaintiff] was at risk for dependency and [was] taking other drugs."[13] (Doc. # 51-9 at 3, ¶ 13). Scully noted in Plaintiff's DARS file that Plaintiff was "upset" and "expressed anger" at having to take the expanded profile test. (Doc. # 51-5 at 40). Because the expanded test covered a broader scope of medications, Plaintiff -- for the first time -- informed Defendant that he was taking Oxycodone and Methadone and had been for years.[14] (Doc. # 51-1 at 180-81; Doc. # 51-5 at 39-40; Doc. # 51-9 at 17).

On April 4, 2012, after Plaintiff disclosed that he was taking prescribed opioids, Scully revised his recommendations to include, among the previously listed requirements, a thorough medical review of all medications which Plaintiff was prescribed, their medical necessity (with emphasis on prescription management), and a proposed requirement that Plaintiff submit all necessary records for review, including having his physicians provide a "detailed, narrative written report addressing the current status of [Plaintiff's] medical conditions." (Doc. # 51-1 at 199; Doc. # 51-4 at 18; Doc. # 51-9 at 4, 17, ¶ 15).

---

[13] Scully testified that he was not instructed by anyone to give Plaintiff the expanded test, and he did not administer it because of any knee or back condition; his "sole concern was [the] safety of [Plaintiff] and the public." (Doc. # 51-9 at 3, ¶ 13).

[14] Although Plaintiff spoke with Trainmaster Smith and Melissa Farrar (in Defendant's medical department) about an "approved medication list" in 2007, the Rule 56 record is unclear (and inconsistent) with respect to whether Plaintiff informed Farrar about his knee and/or back pain. What is crystal clear though is that Plaintiff did not inform anyone at Norfolk about his prescription medications until he disclosed that information to Scully in April 2012. (Doc. # 51-1 at 173, 308).

Plaintiff requested all his medical records that he had access to, including from Dr. Veluz and Dr. Bates. (Doc. # 51-1 at 198). However, the Rule 56 record is unclear as to whether Plaintiff provided DARS with his medical records from all of his physicians between 2001 and 2012 (i.e., Dr. Boswell, Dr. Ali, Dr. Rampulla, Dr. Veluz, Dr. Bates, etc.). What is clear, though, is that the Rule 56 record is devoid of any "detailed, narrative written report" from any physician regarding Plaintiff's prescription medication regimen that was produced after Norfolk requested Plaintiff's medical records.

On April 16, 2012, Plaintiff had a follow-up appointment with Dr. Veluz. (Doc. # 51-5 at 20). During this visit, Dr. Veluz decreased Plaintiff's Oxycodone regimen by 45 milligrams per month and decreased his Methadone regimen by 10 milligrams per month. (Doc. # 51-5 at 20).

On April 20, 2012, Norfolk sent Plaintiff a follow-up letter regarding his medication regimen. (Doc. # 51-4 at 18). Norfolk requested Plaintiff provide additional information about all medical records from every doctor Plaintiff had seen regarding his knee and back pain. Norfolk also placed Plaintiff on a "medical hold," stating that he could "not perform railroad service until the Medical Department determine[d] [his] fitness for service." (Doc. # 51-4 at 18). Plaintiff was advised of what would need to occur in order for him to receive medical clearance and return to his position; these actions included submitting the medical records and reports mentioned above. (Doc. # 51-4 at 18). The letter also "serve[d] as [Plaintiff's] temporary proof of disability" for purposes of claiming supplemental sickness benefits. (Doc. # 51-4 at 19). Plaintiff was not permitted to work as a conductor until he provided the required information. (Doc. # 51-4 at 18).

In late April and early May 2012, Plaintiff spoke with Scully about obtaining his medical records. (Doc. # 51-5 at 43). Plaintiff told Scully a doctor had suggested he come off the pain medications, but he found the withdrawal overwhelming. (Doc. # 51-5 at 43). Scully asked

Plaintiff if he would "be willing to seek treatment and be willing to go through detox." (Doc. # 51-5 at 43). Plaintiff responded that he "would rather chew on a gun barrel." (Doc. # 51-5 at 43). Scully then informed Plaintiff that "[he] would not be able to return to railroad safety sensitive work unless he followed that path." (Doc. # 51-5 at 43-44). Plaintiff understood but told Scully that "it was just not possible, that his pain problem [was] too severe[,] and that he could not take the effects of withdrawal from his current medication." (Doc. # 51-5 at 44). Although the thought of withdrawing bothered Plaintiff, he claims to have "never suffered any side effects" from the use of his medications. (Doc. # 51-1 at 180).

On May 10, 2012, Plaintiff saw Dr. Flippo with Deerfoot Internal Medicine in Birmingham, Alabama. (Doc. # 51-5 at 51). Plaintiff saw Dr. Flippo because "[h]is [prior] pain management physician . . . had his licensed revoked and [Plaintiff] was in dire straits" as "other pain management physicians [were] not accepting [the prior physician's] patients." (Doc. # 51-5 at 51). Dr. Flippo prescribed Plaintiff forty 10 milligram pills of Methadone and forty 30 milligram pills of Oxycodone "to provide some therapy while [Plaintiff] bec[ame] established with another pain clinic." (Doc. # 51-5 at 53). Plaintiff did not provide Norfolk with any records related to Dr. Flippo. (Doc. # 51-1 at 260).

On May 21, 2012, Plaintiff called Scully to express his concern over not working and not receiving a paycheck or money "for his disability or sick time." (Doc. # 51-5 at 44). Scully told Plaintiff that he did not qualify for sick benefits "due to the lack of serious disability." (Doc. # 51-5 at 44). Scully also told him that "he could render a favorable disability if he were to address his physiological dependence on opiates [by] detox[ing] and hav[ing] his pain re-evaluated by an addictionologist with a pain specialty." (Doc. # 51-5 at 44). Plaintiff refused. (Doc. # 51-5 at 44).

On May 22, 2012, Rachel Randall, a Norfolk employee who worked as an Occupational

Health Nurse Assistant, spoke with Plaintiff regarding his medical records for his DARS file and medical review. Plaintiff told Randall that he could not get any records from Dr. Boswell because his practice had shut down and that he could not get any records from Dr. Rampulla because he died in a bicycle accident in 2010.[15] (Doc. # 51-4 at 21).

On July 5, 2012, Plaintiff saw Dr. J. Logan Casey with the Seale Harris Clinic and sought to be established as a new patient so that he could obtain Adderall. (Doc. # 51-5 at 55). On July 6, 2012, Plaintiff spoke with Scully "about occupational if he would be allowed to work in another department that was not hours of service." (Doc. # 51-5 at 46). From May 2012 to August 2012, Plaintiff expressed his concerns to Scully about his work status and not receiving "a disability payment." (Doc. # 51-5 at 43-48). On August 29, 2012, Plaintiff met with Scully one last time to be released from the DARS program. (Doc. # 51-5 at 48). However, at that time, Norfolk did not yet have all of Plaintiff's requested medical records. (Doc. # 60-1 at 1).

On September 24, 2012, Norfolk informed Plaintiff that it received all of his available medical records from his current providers. On the same day, Plaintiff completed the DARS program. (Doc. # 51-9 at 4, ¶ 18; Doc. # 60-2 at 1). Jack Scott, Manager of the DARS program, informed Dr. Prible that Plaintiff's DARS counselor, Scully, "believe[d] that [Plaintiff] [was] a good risk for return to safety sensitive duties insofar as substance abuse [was] concerned." (Doc. # 51-9 at 20). Notwithstanding, Dr. Prible notified Plaintiff that his "medication regimen continue[d] to be inconsistent with [its] guidelines. (Doc. # 60-2 at 1). Therefore, Norfolk sent Plaintiff one final letter informing him that, based on its review of his available medical records dated through September 15, 2012, Plaintiff was "not medically fit for service as a Conductor

---

[15] The Rule 56 record makes clear that Plaintiff claims he attempted to get all his medical records to Defendant; however, Plaintiff was unable to produce everything Defendant requested, and what he was able to submit was clearly incomplete and untimely, as it was given later than the 15-day deadline listed in the April 20, 2012 letter.

pending a documented improvement in [his] chronic pain condition." (Doc. # 51-5 at 26).

Specifically, Defendant noted:

> According to the most recent office visit note received, you continue to take oxycodone 30mg – 2 pills every 6 hours, methadone 10mg – 2 pills in morning, 2 pills at noon and 1 pill in the evening[,] and Zanaflex 4 mg 1 pill twice daily.[16]
>
> Your current pain medication regimen is not consistent with Norfolk Southern medication guidelines for oxycodone and methadone. Specifically, Norfolk Southern Medical Department guidelines for your position of Conductor prohibit use of oxycodone within a minimum of 6 hours prior to reporting to work or while on duty. Norfolk Southern Medical Department guidelines for your position of Conductor also prohibit use of methadone.
>
> . . . .
>
> In the event your medication regimen changes, and upon a significant improvement in, and control and stability of your chronic pain condition for a minimum 90 day period (while on a pain medication regimen consistent with Norfolk Southern Medication Department medication guidelines), please have your treating doctor(s) provide all medical records since September 15, 2012 documenting that improvement. These records should include all doctor's office visit/progress notes, evaluation reports, diagnostic test results, operative reports (if applicable) and treatment records.

(Doc. # 51-5 at 26). On the last page of the letter, Dr. Prible wrote: "[i]n the interim, you may wish to be considered for employment in another position in which there is a vacancy for which you qualify and in which you can work safely." (Doc. # 51-5 at 28). After Plaintiff received this letter, he did not file any additional medical records. Rather, on September 26, 2012, he filed a Charge of Discrimination with the Equal Employment Opportunity Office ("EEOC"), alleging disability discrimination.[17] (Doc. # 1-1). Although Plaintiff was prohibited from working as a conductor, his

---

[16] Plaintiff testified that between April and September 2012, his Oxycodone and Methadone levels were decreased as his doctor, Dr. Bates, was "titrating" him down. (Doc. # 51-1 at 219). He told Dr. Bates he wanted to be titrated down because he was trying to work with Dr. Prible as much as he could to get back to work. (Doc. # 51-1 at 220). However, between April and September 2012, Plaintiff never completely stopped taking Oxycodone and/or Methadone. (Doc. # 51-1 at 221).

[17] On September 5, 2014, the EEOC issued a "Determination Letter," finding that "there [was] reasonable cause to believe that [Defendant] removed [Plaintiff] from his position as a conductor[] and placed him on an indefinite medical hold[] because of his disability, his record of a disability, and because it regarded him as disabled, in violation

employment with Defendant was never terminated.

On January 14, 2013, Plaintiff contacted Defendant's department of Vocational Rehabilitation Services ("VRS") to inquire about other, vacant positions.[18] (Doc. # 51-1 at 229; Doc. # 51-11 at 2, ¶ 5). Plaintiff initially spoke with the Vocational Rehabilitation Assistant Manager, Shawna Baines. (Doc. # 51-11 at 1-2, ¶¶ 2, 5). Baines explained the VRS process to Plaintiff and requested that he start "by completing a profile through the JobSeekers site or updating it. [Plaintiff] indicated [that] he [had] a profile from his previous position and stated that he did not have time to complete a new profile since there was one on file." (Doc. # 51-11 at 7). Baines then explained to him "the importance of updating his profile and the process of being able to use updated information in order to assist him with searching for alternative employment within the company." (Doc. # 51-11 at 7). Plaintiff then "indicated that he was in [l]aw [s]chool and ha[d] a farm and that he would call VRS back at the end of the week once his [cattle] delivered their babies." (Doc. # 51-11 at 7). At the end of the conversation, Baines "encouraged [Plaintiff] to begin the process of updating/completing a resume and career assessment and submitting [it] to VRS for services." (Doc. # 51-11 at 7).

On January 18, 2013, Baines called Plaintiff to discuss completing his profile. She noted that Plaintiff "was reluctant at first but eventually agreed to complete and update his profile." (Doc. # 51-11 at 7). On January 21, 2013, Plaintiff emailed Baines informing her that he had completed his profile and had tried to apply for the Signal Maintainer position in Birmingham, Alabama, but

_____

of the ADA." (Doc. # 60-6 at 2). The EEOC concluded that Defendant had "failed to make an individualized assessment of [Plaintiff's] impairment and use of prescribed medications by using objective evidence and reasonable medical judgment," and it failed "to adequately consider or provide reasonable accommodations that would have eliminated or reduced the alleged threat to an acceptable level." (*Id.*).

[18] Plaintiff testified that although this was the date he first got in contact with someone at VRS, he had "been trying to contact [VRS] for a while . . . [maybe] two to three weeks [before] without anyone ever contacting [him] back." (Doc. # 51-1 at 234).

he was having difficulty doing so and was receiving an error message. (Doc. # 51-11 at 7). In addition to the Signal Maintainer position, Plaintiff testified that he applied online for track gang, chemical safety specialist, supervisory, and non-safety-sensitive office jobs. (Doc. # 51-1 at 230, 235). The track gang position and the chemical safety specialist position were both safety-sensitive, so Defendant did not consider hiring Plaintiff for those jobs. (Doc. # 51-1 at 330). In his deposition, Plaintiff also provided the name of one non-safety-sensitive position that he applied for -- that of claims processor. (Doc. # 51-1 at 326-34).

On February 14, 2013, Matthew Jones, the Vocational Rehabilitation Manager, called Plaintiff to discuss the VRS program and his goals. (Doc. # 51-11 at 8). Jones noted in the call log that Plaintiff "indicated that he was only interested in staying within the Birmingham, Alabama area and that he wanted to stay with Norfolk Southern. . . . [Plaintiff also] indicated that 'he would have to avoid safety sensitive jobs, per Norfolk Southern." (Doc. # 51-11 at 8). On March 27, 2013, Jones called Plaintiff:

> to discuss [his] current VRS status and [Plaintiff's] ability to consider other jobs that were outside of (greater than 2 hours, per [Plaintiff]) his hometown of Chelsea, Alabama. [Jones] asked [Plaintiff] if he would be interested in job openings within the Atlanta, GA area, and [Plaintiff] stated that he would only be interested in jobs within Norfolk Southern that were less than a 2 hour drive from [Chelsea], and included the towns of Montgomery, Ft. Payne, Florence, and Tuscaloosa.

(Doc. # 51-1 at 229; Doc. # 51-11 at 8). Jones informed Plaintiff that he would continue to search for positions, but that "by limiting the job search to only [those] areas, many jobs [would] not be available." (Doc. # 51-11 at 8). Jones was unable to find Plaintiff an available alternate position. (Doc. # 51-11 at 3, ¶ 12).

Plaintiff was never taken off his "medical hold," and on May 30, 2017, he resigned from his employment with Norfolk. (Doc. # 51-5 at 35). On September 22, 2017, the EEOC issued Plaintiff his Notice of Right to Sue letter (Doc. # 1-2), and on December 22, 2017, Plaintiff filed

his initial Complaint in this court. (Doc. # 1).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule

56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the movant would bear the burden of proof at trial, a

> party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed

verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## III.   Analysis

Plaintiff advances one claim against Defendant: disability discrimination in violation of the Americans with Disabilities Act, as amended. (Doc. # 1). Specifically, Plaintiff alleges Defendant discriminated against him by failing to accommodate his knee and back pain through placing him in another position at Norfolk Southern.

Defendant challenges Plaintiff's claim on three grounds: (1) any claim premised on Defendant's decision to remove Plaintiff from service in February 2012 is time barred; (2) Plaintiff failed to exhaust his administrative remedies with respect to his failure-to-accommodate claim; (3) Plaintiff failed to establish a *prima facie* case of disability discrimination; and (4) Defendant removed Plaintiff from service for a non-discriminatory reason. The court addresses each argument, in turn. After careful review, the court concludes that Defendant is not entitled to summary judgment on Plaintiff's claim of disability discrimination.

### A.  Plaintiff's Disability Discrimination Claim is Not Time-Barred

Defendant contends that, to the extent Plaintiff alleges disability discrimination based on his removal from service because of his positive cocaine test in February 2012, it is time barred. The court agrees that if Plaintiff's claim was based on his positive cocaine test in February 2012,

it would be time barred. "[A]n ADA[19] plaintiff must file a charge complaining about an allegedly unlawful employment practice . . . with the EEOC within 180 days of the [last discriminatory] employment practice." *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) (citing 42 U.S.C. § 2000e–5(e)(1)); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005). Plaintiff filed his EEOC Charge on September 26, 2012 -- which clearly falls outside the 180-day window if calculated from February 2012.

However, as his EEOC Charge indicates, Plaintiff's suit rests on his claim that Defendant failed to provide him with a reasonable accommodation when it decided to remove him from service on April 20, 2012. (Doc. # 1-1). Fewer than 180 days passed between April 20, 2012 and September 22, 2012, even without invoking use of the continuing action doctrine. Therefore, Plaintiff timely filed his EEOC Charge.

## B.  Plaintiff's Failure-to-Accommodate Claim and Administrative Exhaustion

"Prior to filing an action in federal court for discrimination . . . , a plaintiff must file an administrative charge with the EEOC."[20] *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892 (11th Cir. 2014) (citing *Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004)) (discussing the exhaustion requirement in Title VII actions); *see* 42 U.S.C. § 12117(a) (applying remedies and procedures of Title VII to ADA). "The purpose of the exhaustion requirement is to allow the EEOC the first opportunity to investigate the alleged practices and to perform its role 'in obtaining voluntary compliance and promoting conciliation

---

[19] The ADA was amended in 2008 by the Americans with Disabilities Amendments Act of 2008 ("ADAAA"). Therefore, for purposes of this Motion, all references to the ADA are to the Act as amended by the ADAAA.

[20] In the Eleventh Circuit, "to assert a claim under the ADA, an employee 'must comply with the same procedural requirements to sue under Title VII,' and thus, a timely EEOC charge is required under the ADA as well." *Houston v. Army Fleet Servs., L.L.C.*, 509 F. Supp. 2d 1033, 1040 (M.D. Ala. 2007) (quoting *Fry v. Muscogee Cty. Sch. Dist.*, 150 F. App'x 980, 981-82 (11th Cir. 2005)).

efforts.'" *Duble*, 572 F. App'x at 892 (citations omitted). "[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (citations omitted). The Eleventh Circuit has "noted that 'judicial claims are allowed if they "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint,' but [they] have also warned that 'allegations of new acts of discrimination are inappropriate.'" *Anderson v. Embarq/Sprint*, 379 F. App'x 924, 926 (11th Cir. 2010) (quoting *Gregory*, 355 F.3d at 1279-80)). Thus, "[t]he proper inquiry . . . is whether [a plaintiff's] complaint was like or related to, or grew out of, the allegations contained in [his] EEOC charge." *Gregory*, 355 F.3d at 1280; *see Booth v. City of Roswell*, 754 F. App'x 834, 836 (11th Cir. 2018). This is a liberal standard. *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1277 (M.D. Ala. 2011) (citation omitted).

Defendant asserts that Plaintiff failed to exhaust his administrative remedies with respect to his failure-to-accommodate claim because he did not allege in his EEOC Charge that Defendant failed to accommodate his disability. Evaluating Defendant's argument requires the court to review Plaintiff's EEOC Charge. Plaintiff stated in his EEOC Charge that, in April 2012, he was required to take a 10-panel drug test as opposed to the standard 5-panel test, which revealed he was taking pain medication for "[his] disability." (Doc. # 1-1). He also stated that after this test, he was required to forward all of his medical records about his disability to Defendant, his wages were terminated, and he was not permitted to return to work until he quit taking his medication or began a different, lower-dose regimen. (Doc. # 1-1). Because Defendant refused to let him return to work as a conductor unless he stopped taking "the medication for [his] disability," Plaintiff claimed he was "discriminated against because of [his] disability in violation of the Americans with Disabilities Act." (Doc # 1-1).

If Plaintiff's claim before this court was solely that Defendant failed to accommodate him when it refused to allow him to return to work as a conductor, it would be easy to resolve whether Plaintiff administratively exhausted his failure-to-accommodate claim. That claim falls squarely within the parameters of Plaintiff's EEOC Charge. However, Plaintiff's failure-to-accommodate claim has evolved over the course of this litigation. He now argues that his failure-to-accommodate claim is based, in whole or in part, on Defendant's failure to accommodate his disability by placing him in a position other than conductor. (*See* Doc. # 59 at 19). But, in his EEOC Charge, Plaintiff never specifically alleged Defendant discriminated against him by failing to employ him in another position. (Doc # 1-1). Because Plaintiff's claim before this court relies on factual allegations that he never presented to the EEOC, it borders on "allegations of new acts of discrimination" that fail to satisfy the administrative exhaustion requirement. *Gregory*, 355 F.3d at 1279-80.

Perhaps recognizing this omission in his EEOC Charge, Plaintiff urges this court to apply a liberal reading when reviewing its scope. (*See* Doc. # 59 at 20-22). The precedent of this circuit supports such review. The Eleventh Circuit has cautioned district courts to not "strictly interpret[]" the scope of EEOC Charges. *Gregory* at 1280 (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970)). All that our circuit requires is that the plaintiff's claim is "related to [or] or grew out of[] the allegations contained in [his] EEOC charge." *Gregory*, 355 F.3d at 1280. That standard is satisfied here. In his EEOC Charge, Plaintiff alleged Defendant discriminated against him by refusing to allow him "to return to work" as a conductor. (Doc. # 1-1). Without question, the allegation that Defendant later discriminated against him by refusing to allow him to return to work in other capacities is "related to" the claim he raised in his EEOC Charge. Therefore, Plaintiff's EEOC Charge satisfies the administrative exhaustion requirement.

### C.  Plaintiff Has Established a *Prima Facie* Case of Disability Discrimination

In his complaint, Plaintiff claims that Defendant discriminated against him because of his disability (i.e., his knee and back pain) by failing to provide him with a reasonable accommodation. Specifically, Plaintiff testified that he believes he was discriminated against "due to [his] disability of having to take medication for [his] impairments;" that is, his knee pain and back pain. (Doc. # 51-1 at 16). Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[T]he term 'discriminate against a qualified individual on the basis of disability' includes, among other things, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .'" 42 U.S.C. § 12112(b)(5)(A).

When there is no direct evidence of discrimination (as is the case here), the Eleventh Circuit applies the *McDonnell Douglas* burden-shifting framework to disability discrimination claims brought under the ADA. To state a *prima facie* claim for failure to accommodate, the plaintiff must show that: (i) he is disabled; (ii) he is a qualified individual; and (iii) he was discriminated against by defendant's failure to provide a reasonable accommodation."[21] *Williamson v. Clarke Cty. Dep't of Human Resources*, 834 F. Supp. 2d 1310, 1319 (S.D. Ala. 2011) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)); *see Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018). "Once the plaintiff establishes a *prima facie* case of discrimination under the ADA, if the employer articulates a legitimate, non-discriminatory reason for its alleged discriminatory action, the plaintiff must show that the reason was merely a pretext for

---

[21] Importantly, "[t]he ADAAA amendments . . . do not affect the elements of a plaintiff's *prima facie* case." *Cooper*, 2015 WL 9311964, at *3 (quoting *Howze v. Jefferson Cty. Comm. for Econ. Opportunity*, 2012 WL 3775871, *10 (N.D. Ala. Aug. 28, 2012)).

discrimination." *Dulaney v. Miami-Dade Cty.*, 481 F. App'x 486, 489-90 (11th Cir. 2012) (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)). "A plaintiff may show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 490 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

In its Motion for Summary Judgment, Defendant contends that Plaintiff has wholly failed to establish a *prima facie* case of disability discrimination under the ADA. The court analyzes each prong of the test, in turn.

### 1. Plaintiff Has Sufficiently Established that He Is Disabled Under the "Regarded As" Prong of the ADA

With respect to the first element of the *prima facie* test, the ADA defines "disability" as "(A) a physical or mental impairment that substantially limits[22] one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[23] 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1)(i). The statutory language of the ADAAA mandates that the "definition of disability . . . be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." § 12102(4)(A). The "determination of whether an impairment substantially limits a major life

---

[22] "The term 'substantially limiting' comprises either (1) the inability to perform a major life activity that the average person in the general population can perform, or (2) a significant restriction as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to that of the average person in the general population." *E.E.O.C. v. American Tool & Mold, Inc.*, 21 F. Supp. 3d 1268, 1274 (M.D. Fla. Apr. 16, 2014) (citing *Loperena v. Scott*, 2009 WL 1066253, at *12 (M.D. Fla. Apr. 21, 2009) (citations omitted) *aff'd*, 356 F. App'x 240 (11th Cir. 2009)).

[23] "When it enacted the ADAAA, Congress indicated that one of its purposes was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (quotation omitted).

activity shall be made without regard to the ameliorative effects of mitigating measures such as … medication." §§ 12102(E)(i), (E)(i)(I).

Here, Plaintiff asserts that he is an individual with a disability, he has a record of a disability, and he was regarded by Defendant as being disabled. Although the court rejects the first two arguments, Plaintiff has established a material issue of fact regarding whether Defendant regarded him as being disabled.

### a.    Plaintiff Has Failed to Establish He Has a Substantially Limiting Physical Impairment

A "[p]hysical . . . impairment means— (1) [a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . musculoskeletal . . . ." 29 C.F.R. § 1630.2(h)(1). An impairment qualifies as a disability if it:

> substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii). "[M]ajor life activities include, but are not limited to, . . . walking, standing, [and] lifting . . . ." § 12102(2). Importantly, however, "a physical impairment alone is not necessarily a disability under the ADA." *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) (citation omitted).

Here, Plaintiff has failed to establish that he had a substantially limiting physical impairment under the ADA. With respect to his knee pain and back pain, the Rule 56 record demonstrates that Plaintiff has suffered knee pain (at least in part due to an ACL tear and surgery in 1994) and back pain (at least in part due to an alleged L4 sagittal tear) since 2006 or 2007. However, Plaintiff has provided no medical documentation from a treating physician showing the cause of his pain, nor has he demonstrated how, or in what manner, his pain substantially limits

his daily activities without pain medication or how it compares to that of the general population. Further, he has not identified any major life activity that is substantially limited because of his knee pain. The only Rule 56 evidence regarding Plaintiff's pain is his deposition testimony stating that he "was having issues with pain in [his] knees and [his] back from walking and climbing up and down" (Doc. # 51-1 at 173), as well as medical reports from his pain management physicians (none of which formally diagnosed him with any impairment in his knee and/or back) detailing what he relayed to them.[24] But, apart from this vague assertion, nothing in the Rule 56 record indicates what the major life activity is that was substantially limited by his alleged disability (let alone how that substantial limitation compares to that of the general population). *See Gilliard v. Georgia Dep't of Corrs.*, 2012 WL 12951863, at *25 (N.D. Ga. Mar. 2, 2012) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002), *superseded in part by* ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008)); *May v. American Cast Iron Pipe Co*., 2014 WL 1043440, at *5 (N.D. Ala. March 17, 2014) ("'[T]he mere existence of a physical impairment does not constitute a disability under the ADA;' the statute requires that the physical impairment must also substantially limit a major life activity.") (quoting *Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1328 (11th Cir. 1998)).

Consequently, although the ADA mandates "extensive coverage" and is "not meant to be a demanding standard," the court concludes that Plaintiff has failed to establish that he suffered from a substantially limiting impairment, as defined by the ADA. *Mazzeo*, 746 F.3d at 1269 (quotation omitted).

---

[24] The court notes that although Plaintiff testified that Dr. Ali ordered an MRI for Plaintiff, which showed evidence of the L4 tear, there is no medical documentation or other evidence in the Rule 56 record supporting this assertion.

**b.**        **Plaintiff Has Failed to Establish a Record of a Disability**

In order for a plaintiff to establish a "record of [an] impairment," he must establish that he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities" when compared to most people in the general population. *Hilburn*, 181 F.3d at 1229 (quoting 29 C.F.R. § 1630.2(k) (1997)). Although Plaintiff has produced documentation from his pain management specialists reflecting his complaints of knee and/or back pain, Plaintiff has failed to establish that his alleged disability substantially limited him in at least one major life activity. *See Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1157 (11th Cir. 2005) (concluding that although the plaintiff presented evidence of a long history of diabetes, "[t]here was no evidence from which a jury could determine that [the plaintiff's] diabetes ha[d] ever substantially limited him in any major life activity").

**c.**        **Plaintiff Has Sufficiently Established that Defendant Regarded Him as Being Disabled**

It is well established that "[the] post-ADAAA formulation of the 'regarded-as' standard is markedly different from its predecessor." *Cooper v. CLP Corp.*, 2015 WL 9311964, *4-5 (N.D. Ala. Dec. 23, 2015) (quoting *Powell v. Gentiva Health Services, Inc.*, 2014 WL 554155, at *7 n.14 (S.D. Ala. Feb. 12, 2014)). Before the enactment of the ADAAA, "'regarded-as' liability hinged on the employer's belief that the employee's actual or perceived impairment substantially limited one or more major life activities. [However,] [u]nder the new ADAAA standard . . . , perception of an impairment is all that is necessary, 'whether or not the impairment limits or is perceived to limit a major life activity.'" *Id.* (quoting 42 U.S.C. § 12102(3)(A)) (emphasis added). Thus, an ADA plaintiff must show that "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis

added). Indeed, "[t]he relevant inquiry . . . is not the plaintiff's actual condition, but how the Defendant 'perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him.'" *American Tool & Mold, Inc.*, 21 F. Supp. 3d at 1275 (quoting *Mayorga v. Alorica, Inc.*, 2012 WL 3043021, at *8 (S.D. Fla. July 25, 2012)).

Here, construing the Rule 56 record in the light most favorable to Plaintiff, he has sufficiently established that Defendant regarded him as having a physical impairment. Not only did Plaintiff inform Defendant on a few occasions that he was dealing with knee and back pain, but Defendant had knowledge of Plaintiff's knee and back pain after it placed him on an indefinite medical hold on September 24, 2012 and requested medical documentation from all of his treating physicians.[25] Moreover, the September 24, 2012 letter "serve[d] as [Plaintiff's] temporary proof of disability." (Doc. # 51-4 at 19). Therefore, a reasonable jury could find that Defendant perceived Plaintiff as having an underlying impairment that necessitated his use of Oxycodone and Methadone. *See Lisby*, 2020 WL 1536386, at *5 (concluding that the plaintiff's use of amphetamines and methadone -- for ADD and chronic back pain -- could permit a jury to "infer that [the defendant] perceived [the plaintiff] to have underlying disabling conditions that required him to take those medications").

Consequently, Plaintiff has sufficiently established that he is disabled, as that term is defined under the "regarded as" prong of the ADA.

---

[25] The court briefly notes that Plaintiff has not opposed or challenged Defendant's medical inquiries under 42 U.S.C. § 12112(d)(4)(A). Under that section, "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(4)(A). Because Plaintiff does not assert any specific opposition to this request, the court cannot conclude that Defendant's medical inquiries were inappropriate under § 12112(d)(4)(A).

**2. Issues of Material Fact Exist as to Whether Plaintiff Is a Qualified Individual Under the ADA**

Under the second element of the *prima facie* test, a plaintiff must establish that he is a "qualified individual." The ADA defines "qualified individual" as an individual with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007); *see* 42 U.S.C. § 12111(8)).

Under the ADA, an employer cannot:

> "discriminate against a qualified individual on the basis of disability" by "using qualification standards ... that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6). "By that same definition ... as well as by separate provision, § 12113(a), the [ADA] creates an affirmative defense for action under a qualification standard 'shown to be job-related for the position in question and ... consistent with business necessity.'" *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 78 (2002) (quoting 42 U.S.C. § 12112(b)(6)). A qualification standard may include a requirement that an individual shall not pose a direct threat to the health and safety of himself or others in the workplace. *Id.*; 29 C.F.R. § 1630.15(b)(2).

*Pollard v. Drummond Co.*, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015). With respect to an employee who poses a "direct threat," an employer may discriminate against him if the threat "cannot be eliminated by reasonable accommodations." *Nevitt v. U.S. Steel Corp.*, 18 F. Supp. 3d 1322, 1333 (N.D. Ala. 2014) (quoting 42 U.S.C. § 12111(3)) (citing *Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006)).

> An employer must decide whether an employee poses a direct threat "'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job.'"

*Lisby v. Tarkett Ala., Inc.*, 2020 WL 1536386, *6 (N.D. Ala. Mar. 31, 2020) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002)). But, "an assessment based on the known possible side effects of a medication, as opposed to an individualized inquiry into a patient's

28

present ability to perform his job functions, is insufficient." *Pollard*, 2015 WL 5306084, at \*7 (citing *Haynes v. City of Montgomery*, 2008 WL 4495711, at \*4-5 (M.D. Ala. Oct. 6, 2008)). "In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Jordan*, 94 F. Supp. 3d at 1342 (quoting 29 C.F.R. § 1630.2(r)). Importantly, in the Eleventh Circuit, the plaintiff "carries the burden of establishing that 'he was not a direct threat or that reasonable accommodations were available.'" *Waddell v. Valley Forge Dental Assoc., Inc.*, 276 F.3d 1275, 1280 (11th Cir. 2001) (quotation omitted). With this case law in mind, the court turns to whether Defendant properly determined Plaintiff represented a direct threat to himself or others and, if that determination was erroneous, whether it affected the interactive process.

Because Plaintiff's use of Oxycodone and morphine violated Defendant's medical guidelines, Dr. Prible, acting on behalf of Defendant, determined Plaintiff could not work as a conductor or in any other safety-sensitive position at Norfolk. (*See* Doc. # 51-5 at 26). Specifically, Dr. Prible determined Plaintiff's use of those drugs violated Defendant's medical guidelines against "employees in safety-sensitive and/or non-sedentary positions" taking "short-acting medications that may cause sedation, weakness, fatigue, confusion, dizziness[,] and similar side effects … while at work or within 6 hours … of reporting to work." (Doc. # 51-5 at 26, 30). However, an employer's determination that an employee's use of medication violated certain guidelines, without more, does not amount to the "individualized inquiry into [the employee's] present ability to perform his job functions" required to determine that an employee constitutes a direct threat. *Pollard*, 2015 WL 5306084, at \*7 (citing *Haynes*, 2008 WL 4495711, at \*4-5).

Reviewing what Rule 56 record evidence exists, genuine issues of material fact remain as

to whether Defendant conducted a properly individualized inquiry. In Defendant's final letter to Plaintiff discussing the medical hold, Dr. Prible stated he "reviewed" Plaintiff's medical records. (Doc. # 51-5 at 26). But the comprehensiveness of that review is unclear, so it is best for a jury to decide whether Dr. Prible considered the duration of the risk posed by Plaintiff's prescription usage, the nature and severity of the potential harm, the likelihood that the potential harm would occur, and the imminence of the potential harm. *See Jordan*, 94 F. Supp. 3d at 1342; 29 C.F.R. § 1630.2(r). Nor is it clear whether anyone in the DARS program properly concluded that Plaintiff's use of painkillers should bar him from safety-sensitive positions.[26] And, Plaintiff points to record evidence showing he could have performed the essential functions of a conductor or another safety-sensitive role without posing a direct threat to himself or others. For example, Dr. Veluz believed Plaintiff "ha[d] no side effects from his medication" and was "able to perform all duties of his job. (Doc. # 51-5 at 15).[27] Plaintiff shared documentation of Dr. Veluz's medical opinions on this subject with Defendant. (Doc. # 51-1 at 208-09). After reviewing this record evidence, a reasonable jury could find that Defendant, by failing to conduct an individualized inquiry, improperly barred Plaintiff from holding safety-sensitive jobs. *See Mlsna v. Union Pacific Railroad Co.*, 5511988 WL 2020, at *7 (7th Cir. Sept. 14, 2020) (finding genuine issues of material fact existed as to whether the employer's "reasonable accommodation assessment [] was artificially restrained" when the employer barred a disabled employee from certain positions because of the employee's disability). To be clear, nothing in this opinion should be read as requiring an employer to retain an employee in a safety-sensitive position if the employee acts in

---

[26] The record evidence that does exist tends to tilt in favor of Plaintiff's case. As mentioned above, Plaintiff's DARS counselor, Scully, "believe[d] that [Plaintiff] [was] a good risk for return to safety sensitive duties insofar as substance abuse [was] concerned." (Doc. # 51-9 at 20).

[27] Plaintiff also testified that "he never experienced side effects from any of the painkillers he took. (Doc. # 51-1 at 180)

ways (or engages in activities) that put the employee and/or others in danger. Employers, however, cannot subject an employee with a disability to an adverse employment action without first ensuring that the employee cannot conduct the essential functions of his job.

A related issue involves the interactive process. Employers must provide "reasonable accommodations" for disabled employees, "unless doing so would impose an undue hardship on the employer." *Williamson*, 834 F. Supp. 2d at 1319 (quoting *Crutcher v. Mobile Hous. Bd.*, 2005 WL 2675207, at *11 (S.D. Ala. Oct. 20, 2005)). In this circuit, "an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" *Williamson*, 834 F. Supp. 2d at 1320 (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)). "Indeed, 'before an employer's duty to provide reasonable accommodations—or even to participate in the "interactive process"—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice.'" *Id.* With respect to making an "adequate request," "at a minimum, the employee must request some change or adjustment in the workplace *and* must link that request to his disability, rather than simply presenting the request in a vacuum." *Id.* (citing authorities); *see Lucas*, 257 F.3d at 1255-56 ("The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions."); *see Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, 2002 WL 31994335, *4 (E.E.O.C. Guidance Oct. 17, 2002) (explaining, by way of example, that an employee's request for a new chair, without more, is insufficient to request a reasonable accommodation where the employee "does not link his need for the new chair with a medical condition"). Moreover, because the ADA "envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be

reasonably accommodated . . . an employer cannot be liable for failure to accommodate if a breakdown in that process is attributable to the employee." *Williamson*, 834 F. Supp. 2d at 1319 (citing *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)); *see Sloan v. Repacorp, Inc.*, 310 F. Supp. 3d 891, 900 (S.D. Ohio 2018) ("[A]n 'employer need not take the employee's word for it that the employee has an illness that may require special accommodation[,]' and, '[i]nstead, the employer has the ability to confirm or disprove the employee's statement' under 42 U.S.C. 12112(d)(4)(A).") (quoting *E.E.O.C. v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998)).

The parties do not dispute that Plaintiff's requests from VRS invoked Defendant's duty to participate in the interactive process. Rather, the parties disagree over who caused the breakdown in the interactive process. Defendant points the finger at Plaintiff, arguing that he caused the breakdown by failing to adequately communicate with VRS and, after availing himself of VRS's assistance, limiting his search to jobs that he was unqualified for or that had no vacancies. (Doc. # 50 at 26-27). Plaintiff, unsurprisingly, points back at Defendant for the breakdown. According to Plaintiff, he cooperated with VRS but was unable to find a job he was qualified for because of Defendant's discriminatory medical guidelines. (Doc. # 50 at 30-32). Defendant's first argument is easily resolved -- Plaintiff was slow to communicate with VRS and to provide his medical records (all of which may never have been provided), but Defendant has not provided any rationale for why these facts led to a breakdown in the interactive process. In fact, VRS assisted Plaintiff in his job search, and Plaintiff applied for a number of jobs through VRS. (Doc. # 51-1 at 230, 235). Therefore, a jury could find that any breakdown in the interactive process cannot be attributed to delays by Plaintiff or a lack of medical records. Evaluating Defendant's second argument is more complicated. Defendant disqualified Plaintiff from a number of safety-sensitive jobs, including a

track gang position and a chemical safety specialist position, on account of Plaintiff's violation of Defendant's medical guidelines. (Doc. # 51-1 at 330). As mentioned above, however, a genuine dispute exists over whether Defendant engaged in the necessary individualized inquiry. And, it is for a jury to decide whether Defendant improperly limited the number of jobs Plaintiff was qualified for on account of his disability and whether Defendant failed in its duties to engage in the interactive process. Defendant casts the blame on Plaintiff and argues that VARS limited its search to jobs close to Birmingham, Alabama because Plaintiff limited the geographical scope of his job search. (Doc. # 50 at 27). But this is a red herring. Plaintiff's geographical preferences are irrelevant to the question of whether Defendant wrongfully disqualified Plaintiff from safety-sensitive jobs within Plaintiff's search parameters on account of his disability.[28] Because Defendant does not dispute that Plaintiff would otherwise be qualified for these safety-sensitive positions, the court finds a reasonable jury could attribute the breakdown in the interactive process to Defendant.

Consequently, the court concludes that genuine issues of material fact remain as to whether Plaintiff is a qualified individual under the ADA.

### 3. Plaintiff Has Established Genuine Issues of Material Fact Exist as to Whether He Was Discriminated Against by Defendant's Failure to Provide a Reasonable Accommodation

It is clear that Plaintiff suffered an adverse employment action: he was placed on a medical hold and his salary was suspended. However, this employment action is not dispositive of whether Defendant discriminated against Plaintiff because of his disability.

In the Eleventh Circuit, a "plaintiff is not required to establish that his disability was the

---

[28] The parties also dispute whether any non-safety sensitive jobs existed which Plaintiff was qualified for and which fell within Plaintiff's search parameters. The court finds there are genuine issues of material fact on this point that are still in dispute.

sole basis for his discrimination[] but need only show that his disability was a determinative factor." *Andrews v. City of Hartford*, 700 F. App'x 924, 926 (11th Cir. 2017) (citing *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999)). Here, viewing the Rule 56 evidence in the light most favorable to Plaintiff, the court concludes genuine issues of material fact exist as to whether Defendant discriminated against him because of his disability. As discussed above, Defendant may have improperly disqualified Plaintiff from all safety-sensitive jobs at Norfolk by failing to properly conduct an individualized inquiry into his disability. And, Defendant -- via VRS -- may have failed to properly engage in the interactive process by refusing to consider Plaintiff for safety-sensitive jobs. Construing the Rule 56 record in the light most favorable to Plaintiff, these facts are sufficient to establish a *prima facie* case of disability discrimination under the ADA. But, this is not enough to survive summary judgment. Employers are entitled to summary judgment, even when faced with a *prima facie* case of disability discrimination, if they can articulate a legitimate, non-discriminatory reason for the adverse employment action and the plaintiff fails to show that reason is a pretext for unlawful discrimination.

### D. Although Defendant Has Articulated a Reason for Plaintiff's Medical Hold, it is for a Jury to Decide if that Reason was Non-Discriminatory

If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to rebut the resulting presumption of discrimination by articulating a legitimate, non-discriminatory reason for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant succeeds, the burden then shifts back to the plaintiff to show that the employer's proffered reason was pretextual. *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Defendant has provided only one reason for placing Plaintiff on a medical hold. According to Defendant, it placed Plaintiff on a medical hold solely due to Plaintiff's use of Oxycodone and Methadone. (Doc. # 50 at 25). But, as discussed above, genuine issues of material fact exist as to

whether Defendant placing Plaintiff on a medical hold (and disqualifying him from all safety-sensitive jobs) was for a legitimate, nondiscriminatory reason. Because a genuine issue of fact exists as to whether Defendant acted for a legitimate, non-discriminatory reason, a jury must resolve the fact questions in this case. As such, Defendant is not entitled to summary judgment on Plaintiff's claim of disability discrimination.[29]

## IV.    Conclusion

For all the foregoing reasons, the court concludes that Defendant's Motion for Summary Judgment (Doc. # 49) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this September 17, 2020.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[29] The court understands that if this case proceeds to trial Plaintiff may find it difficult to convince a jury that Defendant violated the ADA when it placed him on a medical hold for using morphine and Oxycodone while working as a conductor. But, it is emphatically the job of the jury to assess that contention.